UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PHILLIP W. WHEELINGTON,            )
                                   )
            Plaintiff,             )
                                   )
       v.                          )   No. 4:04 CV 1598 CAS
                                   )                    DDN
JO ANNE B. BARNHART,                )
Commissioner of                    )
Social Security,                   )
                                   )
            Defendant.             )

**MEMORANDUM and ORDER**

This case is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Phillip W. Wheelington for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401. et seq.

**I. Background**

**A. Plaintiff's Application and Medical Records**

Plaintiff Wheelington applied for disability insurance benefits, alleging he became disabled on February 8, 2001, on account of impairments of his lower back, and to both legs, knees, and feet, due to an injury. (Tr. 108.) Plaintiff reported aching, throbbing, numbness, pins and needles, and sharp pains located in his low back, both legs, both knees, and both feet. (Id.) He said this pain occurred while walking, standing, stooping, bending, kneeling, and squatting. (Id.) He reported nothing relieved the pain. At that time he was taking Hydrocodone[1] and Celebrex.[2] He reported an inability to walk, bend, stand, kneel, stoop or have sexual intercourse. His wife prepares

---

[1]Hydrocodone is a combination narcotic and non-narcotic used to treat moderate to severe pain. Webmd.com (last visited December 16, 2005).

[2]Celebrex is a nonsteroidal anti-inflammatory drug used to relieve pain and swelling. Webmd.com (last visited December 16, 2005).

meals and does the shopping. (Tr. 109.) He drives to his mother's house, and to the doctor. (Tr. 110.) He reported being irritable and depressed, and was no longer able to go to church because he was unable to sit that long. (Tr. 111.)

In his work history report, plaintiff stated he worked as a housekeeper in a hospital from 1984 to 1989. (Tr. 116.) At this job, he would walk, stand, kneel, crouch, and handle big objects for seven hours per day, and sit for one hour. He would lift as much as 50 pounds, and 25 pounds frequently. (Tr. 117.) From 1991 to 1993, plaintiff worked at a hotel as a bus boy and "bar back." (Tr. 116.) These job responsibilities included walking, standing, kneeling, crouching, handling big objects for 7 ½ hours per day, and sitting for one half hour. Again, he lifted as much as 50 pounds, and he did so frequently. (Tr. 118.)

From 1995 to 1997, plaintiff worked in a factory. (Tr. 116.) In a 12 hour workday, 4 days a week, he reported walking, standing, handling big objects, and handling small objects for 11 ½ hours. He reported sitting for one hour, climbing for three hours, kneeling for two hours, and crouching for two hours. Again, he would lift 50 pounds, and do so regularly. (Tr. 119.)

From 1998 to 2002,[3] plaintiff worked as a painter and laborer for a construction company. He was required to walk, stand, climb, kneel, crouch, crawl, stoop and handle big objects for seven hours per day. (Tr. 120.) He was required to sit for one hour. He lifted up to 50 pounds, and up to 25 pounds frequently. It was at this job that plaintiff was injured while moving a refrigerator; this injury necessitated surgery on his back. (Tr. 35-36.)

During an in-person interview with plaintiff on January 9, 2002, the disability interviewer noted that plaintiff had difficulty sitting, standing and walking. (Tr. 126.) The interviewer also noted plaintiff used a cane to walk, walked very slowly, and stood for a short time during the interview. (Tr. 126.)

---

[3]Plaintiff later stated he held this job until November 2001. (Tr. 130.)

On February 26, 2001, Dr. O'Haver completed a "Certification to Return to Work/School" form for plaintiff. The date line for the return to work was left blank. (Tr. 150.)

On May 7, 2001, plaintiff was examined by Anthony H. Guarino, M.D. He noted subjective complaints of back pain radiating into the legs and knees. (Tr. 151.) He noted plaintiff was currently taking Propoxyphene,[4] Cyclobenzaprine,[5] and Celexa.[6] (Tr. 152.) After conducting a physical exam, the doctor noted mild obesity, and that plaintiff exhibited a lot of pain behavior. The doctor gave him a steroid injection for the pain, and he noted plaintiff had a marked reduction of pain in the office. (Tr. 152.)

On June 4, 2001, plaintiff underwent lumbar laminotomy and microdiscectomy surgery, performed by Frank Petkovich, M.D. His postoperative course was unremarkable and he was discharged on June 5, 2001. It was noted that the wound was clean and dry and that the neurovascular status in both lower extremities was intact. (Tr. 384.)

On August 2, 2001, William W. Baber, M.D., reported on MRI images of plaintiff's lumbar spine. He found good intervertebral disk space, but at L5-S1 there was a loss of disk space indicative of degeneration. He noted there was no evidence of a recurrent of disk herniation or protrusion. (Tr. 187.)

Following the June 2001 surgery, plaintiff had numerous follow-up visits with Dr. Petkovich. On August 15, 2001, Dr. Petkovich noted that the physical examination showed a well healed midline lumbar scar, with no evidence of inflammation. Plaintiff had no evidence of recurrent disc herniation, but the doctor opined that his pain may be consistent with an irritation of the nerve root in the area. He opined plaintiff should go to a pain center for steroid shots. (Tr. 176.)

---

[4]Medication used to treat moderate to severe pain. Webmd.com (last visited December 16, 2005).

[5]A muscle relaxant used to decrease muscle pain and spasms associated with muscle injury. Webmd.com (last visited December 16, 2005).

[6]Celexa is used to treat depression. Webmd.com (last visited December 16, 2005).

-3-

On August 29, 2001, Dr. Petkovich saw plaintiff and noted a well healed lumbar scar. Plaintiff had an MRI of The lumbosacral spine, which was unremarkable. The doctor gave him no new prescriptions. He noted plaintiff "will remain off work for the time being." (Tr. 175.)

On September 10, 2001, plaintiff was again seen by Dr. Petkovich. He noted plaintiff should have a diagnostic evaluation with a repeat lumbar myelogram and post myelogram CT scan to determine what was causing his pain. (Tr. 174.) At a September 19 appointment, Dr. Petkovich could not explain why plaintiff was having subjective complaints of pain after a thorough physical examination. He noted plaintiff had an excellent recovery after surgery. He opined he could do light duty work, but should not lift more than 20 pounds, and no repetitive stooping, kneeling or squatting. (Tr. 172.)

On October 15, 2001, plaintiff was again examined by Dr. Petkovich. He noted plaintiff could go back to work but should not lift more than 35 pounds, and no repetitive stooping, kneeling or squatting. He noted the repeat myelogram and post myelogram CT scan showed no evidence of recurrent disc herniation to explain his pain. (Tr. 170-71.)

On November 5, 2001, plaintiff was examined by Dr. Petkovich. Dr. Petkovich noted that he could continue working, but that he was not to lift more than 35 pounds. The examination was unremarkable. (Tr. 168.)

On November 14, 2001, plaintiff was approved for pain management, as referred by Dr. Petkovich. (Tr. 165.) Dr. Petkovich noted on November 13, 2001, that he hoped to have a better understanding of what was going on at the December 10 scheduled appointment, after plaintiff saw a doctor for pain management. Dr. Petkovich noted he did not prescribe any medication to plaintiff that day. (Tr. 166.) At the November 13 visit, Dr. Petkovich noted plaintiff might be magnifying his symptoms, and suggested he see another doctor for a second opinion since all of his evaluations of plaintiff were unremarkable and did not explain the pain. He noted his midline lumbar scar was well healed, and there was no evidence of inflammation. He opined plaintiff could continue working at his job, but should not lift over 35 pounds or bend, stoop, kneel or squat repetitively. (Tr. 167.)

On December 10, 2001, plaintiff was examined by Dr. Petkovich. Plaintiff had subjective complaints of back pain in all the months following his surgery. An examination showed no evidence of inflammation and a healed midline lumbar scar. X-rays showed excellent overall structural alignment. He was advised to continue working at lighter duty activities with restrictions that he not lift more than 25 to 30 pounds and do no repetitive stooping, bending, kneeling, or squatting. (Tr. 164.)

On January 7, 2002, plaintiff saw Dr. Petkovich, who opined he could find no reason to explain his subjective complaints of pain. He noted plaintiff could continue to do lighter duty activities, but he was not to lift over 25-30 pounds, or do repetitive stooping, bending, kneeling, or squatting. (Tr. 163.)

On January 21, 2002, plaintiff saw Dr. Petkovich for the final time. This was seven and one half months after his surgery for lumbar laminotomy and micro discectomy at the L5-S1 level. A physical examination revealed a well healed mid-line lumbar scar. There was no evidence of inflammation. There was no muscle spasm. The x-rays showed good structural alignment. Dr. Petkovich opined that plaintiff had reached "maximum medical improvement from his injury at work and subsequent surgical procedure. . . ." He recommended that plaintiff be seen by a physiatrist due to his persistent physical complaints. He opined that plaintiff was able to return to light duty type work and sedentary work. He noted he did not need to see the plaintiff for a follow-up. (Tr. 162.)

On February 14, 2002, Dr. Petkovich performed a physical Residual Functional Capacity Assessment of plaintiff. (Tr. 86.) It was determined plaintiff could lift 10 pounds occasionally, 10 pounds frequently, stand or walk for two hours in an eight hour workday, sit for six hours in an eight hour workday, and that he was unlimited in his ability to push or pull. (Tr. 87.) Plaintiff was found able to climb, balance, stoop, kneel, crouch, crawl occasionally. (Tr. 88.) Plaintiff was found to have no manipulative limitations, could reach in all directions, and had no limitations with gross or fine hand and finger manipulation. (Tr. 89.) He was found to be unlimited his in

communicative abilities and his environmental limitations, with the exceptions of being limited to avoid even moderate exposure to vibrations. (Tr. 90.) While the subjective pain experienced by plaintiff was expected given his surgery, the degree to which plaintiff reported the pain was disproportional to the medical findings. (Tr. 91.) It was noted his surgery had been successful, and he was able to complete the sessions without pain. It was noted plaintiff could return to lighter duty work and sedentary work. (Tr. 92.)

On October 19, 2001, plaintiff was examined by James E. Walentynowicz, M.D. He observed that plaintiff was ambulatory in the office, walked with a hunched over gait, and could not straighten to a fully erect position. (Tr. 155.) Plaintiff had 50 percent of normal lumbar flexion and 25 percent lateral bending. He was tender to the slightest touch. (Id.) Despite his inability to stand upright, Dr. Walentynowicz noted no muscular spasm in the lumbar spine. (Tr. 156.) He diagnosed plaintiff with failed laminectomy syndrome for herniated nucleus pulposus. (Tr. 157.) He told plaintiff he had received the appropriate treatment, and that there was little further to offer him by way of treatment at this time. He opined that further surgery was not required, and that physical therapy may be aggravating his condition. He noted walking may be a better form of exercise. In time, the symptoms may diminish. (Id.)

On January 14 and 17, 2002, therapist Joe Hostler performed a Functional Capacity Evaluation (FCE)of plaintiff. Plaintiff's ability to lift and carry were never determined, because the FCE was terminated due to plaintiff's pain before they could be obtained. (Tr. 193.) It was noted that he has "severe limitations" in active lumbosacral range of motion on both testing dates. His endurance was undetermined because plaintiff did not want to perform the treadmill test. It was reported that plaintiff could be at a medium work level, lifting no more than 40 pounds occasionally. (Tr. 194.)

During the FCE, plaintiff put forth poor effort during the static strength testing activities. It was noted plaintiff's subjective complaints of pain ranking 8-9 on a 10 point scale were inconsistent with his arriving and departing from the test with no distress. (Tr.

194.) He was reporting "near emergency" pain levels on both dates, but at times when distracted, he did not display any pain behaviors. His response to a pain questionnaire was indicative of "inappropriate illness behavior." It was noted plaintiff was able to get in his truck upon departure with no problems, putting all his weight on his left leg. Plaintiff tested positive on several symptom magnification indicators. (Tr. 195.) His functional level showed he could not meet the demands of a painter, but that he could have provided better effort. Sedentary work was suggested. At other assessments by the same therapist, is was noted plaintiff was possibly magnifying his symptoms. (Tr. 202.) At all assessments, it was noted plaintiff could do light or medium work. (Tr. 202-210.)

On September 24, 2001, plaintiff participated in a work fitness program. Andy Vitale, OTR/L, examined plaintiff and summarized that plaintiff displayed the functional ability in the medium work demand, that he could lift 25 pounds waist to shoulder, and 25 pounds shoulder to overhead, and 30 pounds bilaterally. His endurance test was poor for his age and gender. He displayed a decreased lumbar range, lifting strength, and postural tolerances. It was opined that plaintiff's "overall displayed function is felt to be inconsistent with subjective reports. . . ." (Tr. 214.) After many visits at ProRehab from July 2001 until October 2001, plaintiff reported no improvement in pain. (Tr. 220-238.)

Plaintiff was referred to Snehal Gahndi, M.D., for back pain. (Tr. 139.) On February 7, 2003, Dr. Gahndi noted that plaintiff had L5-S1 disc surgery for a work related injury in 2001. After performing an exam, Dr. Gahndi opined that plaintiff had a flattened lumbar spine with a midline vertical scar in the lumbar region. (Tr. 139.) His muscles appeared to be atrophic. He reported he walked steadily with a cane. (Id.) Dr. Gahndi opined plaintiff "has back pain of neurologic origin and probably exacerbation from scar tissue from previous surgery." (Tr. 140.)

At a claimant conference held February 14, 2002, it was noted plaintiff was not interested in rehabilitation. (Tr. 95.)

On February 26, 2002, plaintiff was examined by Russell C. Cantrell, M.D. Dr. Cantrell considered plaintiff's medical history as recounted by plaintiff, performed a physical examination, and reviewed prior medical records. It was Dr. Cantrell's opinion that plaintiff's subjective complaints were not related to the reported work injury. (Tr. 147.) He believed that plaintiff demonstrated "an evolution of symptom magnification behaviors that have apparently gradually increased over the course of his treatment." (Id.) He noted that "he has reached the maximum medical improvement" available to him, and that his current condition is remarkable not because of any physical problem, but because of non-physiologic pain behaviors that suggest symptom magnification. (Tr. 148.) He opined plaintiff could return to his regular duty activities without any restrictions. (Id.)

**B.  Testimony of Claimant**

At a hearing held March 25, 2003, before an Administrative Law Judge plaintiff testified that he last worked November 2001. He testified he was injured in January 2001 when he and another man were carrying a refrigerator up a flight of stairs. He stated he suffers from low back pain and pain in his legs. (Tr. 35-36.) He stated raising the toilet seat, reaching to the top of the refrigerator, walking long distances, kneeling, bending, and stooping aggravates the pain. (Tr. 36.) He stated he could stand for one hour, and that he could sit for about one hour. (Tr. 36-7.) He testified he uses a cane for support and a corset for back support. (Tr. 38.) Plaintiff said there is nothing that minimizes the pain. (Tr. 39.) He testified that pain medication did not work and Vicodin[7] caused him drowsiness and dehydration. (Id.)

Plaintiff testified he had an appointment scheduled to see a back specialist. (Tr. 40.) He had the back surgery in 2001, but, he testified, the physical therapy after the surgery increased his pain. (Tr. 41.) He stated he stopped driving a car because of expensive

---

[7]Vicodin is a combination narcotic and non-narcotic used to treat moderate to severe pain. Webmd.com

-8-

repairs, but that he did not believe he would have any trouble driving. He testified he had no problem personally caring for himself. (Tr. 42.)

Plaintiff stated he cleans the house, cooks, and goes shopping, although putting things on the shelf can be painful. He reported sleeping three to four hours a night because of his pain. (Tr. 43.) He does not hunt, fish, do lawn work or garden. (Tr. 44.) He reports getting up at 6:00 a.m., spending time with his wife before she goes to work, fixing something to eat after he watches television, and taking a bath for up to an hour. (Tr. 44.) In the afternoons, he watches television either sitting in the kitchen or laying down in the bedroom. (Tr. 45.)

Plaintiff testified he provided care for a two-year old approximately 10 to 15 days a month. (Tr. 46.) He smokes cigarettes and drinks liquor sometimes. (Tr. 46-47.) The only medication he was taking at that time was Ultram.[8] (Tr. 47.)

**C. Testimony of Plaintiff's Spouse**

Mary Jean Wheelington testified at the hearing held March 25, 2003. She stated plaintiff complained of severe pain in his back, legs, and feet, and that he was angry and depressed. She testified he had expressed a desire to end his life due to the pain and his inability to do things. She said he could not pick up his two-year old son. She said they were unable to engage in a sexual relationship, and that he cries all of the time, often in his sleep. (Tr. 51-52.)

**D. Decision of The ALJ**

In a decision dated May 22, 2003, the ALJ found that plaintiff had not engaged in substantial gainful activity since February 8, 2001. The ALJ found that medical evidence established that plaintiff had a left L5-S1 laminotomy and diskectomy without evidence of recurrent disk herniation or protrusion. (Tr. 28.)

The ALJ determined that plaintiff's subjective complaints of symptoms were not credible and were not consistent with evidence the ALJ

---

[8]Medication used for pain relief. Webmd.com/drugs.

found to be credible. (Tr. 28.) The ALJ determined that objective evidence did not support a finding that plaintiff experienced pain to the degree he alleged. Those who had examined plaintiff noted he had a tendency to exaggerate his symptoms. The ALJ noted that plaintiff had not been taking any strong pain medication, and that he did not seek medical treatment for an entire year. (Tr. 26.)

The ALJ determined that plaintiff had the residual functioning capacity to perform the physical exertions of work involving sitting for more than six hours in an 8-hour work day, no more than two hours of standing or walking in an 8-hour workday, and could lift more than 10 pounds. The ALJ found there to be no non-exertional limitations.

The ALJ found that plaintiff could not perform his past relevant work, but was able to perform a wide range of sedentary work. (Tr. 28.) The ALJ found that plaintiff had a limited education and did not have any acquired skills which were transferrable to the skilled or semiskilled activities of other work. (Tr. 28.) The ALJ determined that based on his age, RFC, education, and work experience, he was not disabled. (Tr. 29.)

The Appeals Council found that there was no basis for changing the ALJ's decision. (Tr. 11.)

## II. Discussion

**A. General legal framework**

The court's role on review is to determine whether the defendant Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir. 2003). In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir. 2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing

substantial evidence exists in the record or because the court would have decided the case differently.  See Krogmeier, 294 F.3d at 1022.

To be entitled to benefits on account of disability, a claimant must prove that he is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months.  See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A) (2004).  A five-step regulatory framework governs the evaluation of disability in general.  See 20 C.F.R. § 404.1520; see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached.  20 C.F.R. § 404.1520(a)(4).

The ALJ determined plaintiff could not perform his past relevant work.  (Tr. 23.)  Therefore, the inquiry for the court is whether there is substantial evidence to support the determination that plaintiff can perform any other relevant work.  See 20 C.F.R. § 404.1520(g)(1).

**B. Residual Functional Capacity**

Plaintiff argues that the ALJ erred when determining his RFC by giving too much weight to the opinion of Dr. Petrovich, even though he was the treating physician.  He argues that the ALJ did not use the factors necessary to determine what weight should be afforded to the medical opinion evidence.

The RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations."  20 C.F.R. § 404.1545(a).  When determining plaintiff's RFC, the ALJ must consider "all relevant evidence" but ultimately, the determination of the plaintiff's RFC is a medical question.  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). As such, the determination of plaintiff's ability to function in the workplace must be based on some medical evidence.  Id.; see also Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

The ALJ found plaintiff's impairments limited his RFC as follows:

-11-

> The claimant has the residual functional capacity to perform
> the physical exertion requirements of work except for work
> involving sitting for more than 6 hours in an 8-hour workday,
> more than 2 hours of standing and/or walking in an 8-hour
> workday, and work requiring lifting in excess of ten pounds.
> There are no nonexertional limits.

(Tr. 28.)

When determining the RFC, "[t]he opinions of the claimant's treating physicians are entitled to controlling weight if they are supported by and not inconsistent with the substantial medical evidence in the record." Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004). "Such opinions are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." Id.; Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). "By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" Singh, 222 F.3d at 452 (quoting Kelley v. Carnahan, 133 F.3d 583, 589 (8th Cir. 1998)). The ALJ must set forth its reasons for the weight given to a treating physician's assessment. Singh, 222 F. 3d at 452.

Here, Dr. Petkovich was plaintiff's treating physician for several months, and his opinion is not inconsistent with the record as a whole. Dr. Petkovich opined plaintiff could lift more than 20 pounds, but not perform repetitive stooping, kneeling, squatting, or bending. (Tr. 172.) When determining plaintiff's RFC, the ALJ determined he could lift no more than 10 pounds, and perform sedentary work, which is in accordance with the determination from plaintiff's own treating physician.

Several other doctors treated plaintiff, and most of them determined there was no objective cause for his pain and believed he was exaggerating his symptoms. Further, even if Dr. Gahndi's opinion that scar tissue could be causing the pain, he placed no further restrictions on plaintiff than the ones by Dr. Petkovich.

Dr. Petkovich did recommend that plaintiff seek a second opinion, which plaintiff argues is a reason for discrediting his opinion. This recommendation, however, was after several appointments with plaintiff,

and after several examinations, where Dr. Petkovich failed to determine any cause for plaintiff's subjective complaints of pain. The ALJ properly afforded more weight to Dr. Petkovich's opinion as plaintiff's treating physician. Dr. Petkovich's opinion was consistent with the record as a whole, and not inconsistent with the substantial medical evidence in the record. He performed numerous exams on plaintiff over the course of months after his surgery, seeking to determine the cause of plaintiff's pain. His opinions were not merely conclusory, and instead repeatedly stated that there was no objective evidence of pain to the degree which plaintiff reported experiencing. His opinion that plaintiff was perhaps exaggerating his symptoms was consistent with the opinions of both Dr. Cantrell and Dr. Walentynowicz.

Therefore, the ALJ's determination of plaintiff's RFC is not in error.

**C. Subjective Complaints**

Plaintiff argues that the ALJ's determination of his credibility was not in accord with the factors stated in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

"The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians . . . ." Polaski, 739 F.2d at 1322. Factors to be considered include the claimant's daily activities, the duration, frequency, and intensity of the pain, any precipitating factors, whether the claimant has been taking pain medication and the dose, and functional restrictions. Id.; Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003). The ALJ may not discredit subjective complaints based solely on personal observation. Polaski, 739 F.2d at 1322. "Subjective complaints may be discounted if there are inconsistencies in the record as a whole." Singh, 222 F.3d at 452. "An ALJ who rejects such complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Id.

The ALJ discredited plaintiff's subjective complaints of pain because several doctors opined he was magnifying his symptoms, that he was taking no strong pain medication, that he had not sought treatment for a year, and discredited his spouse's opinion due to her financial stake in the case. (Tr. 21-27.)

The ALJ may properly determine whether to credit plaintiff's complaints of pain by considering whether he took pain medication. See Depover, 349 F.3d at 566. Plaintiff testified he was taking Ultram, which is for mild pain. The record shows that plaintiff did not request any further medication. At times, Dr. Petkovich did not prescribe him any pain medication and there is no indication plaintiff asked for any. (Tr. 164, 167, 175.) The ALJ did not err by considering plaintiff's non-use of strong pain medication as substantial evidence.

Further, plaintiff stopped seeking treatment for his pain from February 26, 2002 until February 7, 2003. This one year gap in treatment is not indicative of severe pain. "[T]he failure to seek medical treatment for such a long time during a claimed period of disability tends to indicate tolerable pain." Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995). Again, this gap in treatment is substantial evidence supporting the ALJ's decision.

Several medical providers who examined plaintiff stated their opinions that he was magnifying his symptoms. The ALJ may consider a claimant's exaggeration of symptoms. See Jones v. Callahan, 122 F.3d 1148, 1151-52 (8th Cir. 1997). "[T]he objective medical evidence of [plaintiff's] physiological impairments, coupled with evidence that [plaintiff] exaggerated the severity of his symptoms, dictated a finding that [plaintiff's] testimony was not fully credible." Id. at 1152. Here, numerous tests were conducted to determine the source of plaintiff's pain by his treating physician, Dr. Petkovich. All tests were void of any evidence of pain to the extent described by plaintiff. This lack of objective medical evidence coupled with numerous accounts by treating physicians and other individuals that plaintiff was exaggerating his symptoms, is substantial evidence. Dr. Walentynowicz, Dr. Cantrell, and Dr. Petkovich all opined plaintiff was exaggerating his symptoms. (Tr. 91, 147, 155-57, 167, 195, 202, 204.) The ALJ

-14-

properly considered the opinions of multiple doctors when determining that plaintiff's subjective complaints of pain were not fully credible.

Plaintiff also argues that the ALJ did not properly consider the testimony of his wife. The ALJ must consider testimony of family members, but is not required to believe such testimony. Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). Testimony of spouses can be discredited if they have a financial stake in the outcome of the proceedings. Id. Here, plaintiff's wife lived with him and had a financial interest in whether or not he received social security disability benefits. The ALJ's discrediting of her opinion was not unlawful.

For the reasons set forth above, the Court will affirm the decision of the Commissioner of Social Security under sentence 4 of 42 U.S.C. § 405(g).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act and supplemental security income benefits pursuant to Title XVI of the Social Security Act is **AFFIRMED**.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this 15th day of March, 2006.